Sutherland v Tutor Perini Bldg. Corp. (2022 NY Slip Op 04228)

Sutherland v Tutor Perini Bldg. Corp.

2022 NY Slip Op 04228

Decided on June 30, 2022

Appellate Division, First Department

Kennedy, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 30, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Cynthia S. Kern Anil C. Singh Tanya R. Kennedy Manuel Mendez

Index No. 20921/18E Appeal No. 15771 Case No. 2021-02773 

[*1]Owen Sutherland, Plaintiff-Respondent,
v
Tutor Perini Building Corp., et al., Defendants-Appellants.

Defendants appeal from an order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about June 10, 2021, which, insofar as appealed from as limited by the briefs, granted plaintiff's motion for partial summary judgment on so much of the Labor Law § 241(6) claim as based on an alleged violation of Industrial Code § 23-1.7(d).

London Fischer LLP, New York (Anthony P. Malecki of counsel), for appellants.
Wiese & Aydiner PLLC, Mineola (Si Aydiner of counsel), appellate counsel to Law Offices of Spar & Bernstein P.C., New York, for respondent.

Kennedy, J. 

Defendant Tutor Perini Building Corp. (Tutor) was both the general contractor on a project to build a 50-story building, and a concrete subcontractor as to a tower on the site located at 501 West 30th Street, in Manhattan. Nonparty B&R Consultants & Rebar Steel (B&R) employed plaintiff Owen Sutherland as a lather foreman for the project. Plaintiff testified at his deposition that he worked in the steel industry for about 30 years and as a foreman "[a] lot" before he worked on the subject project. He was responsible for his crew's work installing rebar to reinforce concrete beams, slabs, and columns.
On the day of his accident, plaintiff was supervising about six to eight B&R workers. He needed to carry rebar and install it on the 40th floor of the building. Each rebar rod was 24 feet long and weighed about 110 to 120 pounds. He and some of his crew members climbed a ladder to work on an elevated level called a "gantry," which had a plywood floor. They picked up rebar on the gantry, moved it about 10 feet, and handed the rebar over the edge of the gantry to workers on a lower level. It was continuously raining on the day and at the time of the accident. Plaintiff testified that the rain immediately caused the plywood to become slippery, and that he lowered a rebar about five feet down toward a worker on the lower level, when both of his boots slipped, causing him to fall and sustain injuries.
The deposition testimony raised issues of fact as to whether plaintiff's injuries were proximately caused by a slippery condition in violation of Industrial Code (12 NYCRR) § 23-1.7(d), or whether the sole proximate cause was plaintiff's decision, as a foreman, to work on a plywood surface exposed to the elements while it was raining (see e.g. Valle v Port Auth. of N.Y. & N.J., 189 AD3d 594 [1st Dept 2020]; Radeljic v Certified of N.Y., Inc., 161 AD3d 588 [1st Dept 2018]).
On the one hand, plaintiff testified that as the lather foreman on the jobsite, he was responsible for his crew's work installing rebar to reinforce concrete beams, slabs, and columns. He would tell his crew of about 35 or 40 workers "exactly what to do." "[E]very morning," he instructed the crew as to the "jobs they would be performing that day," where to go, and safety issues. He would be responsible for holding safety meetings with his crew and held a safety meeting on the day of the accident. According [*2]to Jesse Mote, who was employed by Tutor as either an assistant superintendent or a junior engineer, he expected "somebody with [plaintiff]'s skill set to say, 'I'm not working up there; this is unsafe.'" Mote explained that "when it does get wet, we absolutely leave it to [the] discretion [of the foreman] to tell us when they feel as though it's unsafe." This testimony may support a finding that plaintiff did have control over the work being performed that day but did not exercise it.
On the other hand, and as pointed out in the dissent, plaintiff also testified that he reported to Phil Bernstock and Greg Shannon, both of whom were general foremen, and he received instructions from Bernstock. Bernstock directed plaintiff as to what he and his crew needed to do on a daily basis, except those days when plaintiff already knew what to do based on Bernstock's earlier instructions. Plaintiff explained that the jobsite had dedicated safety managers. On the day of the accident, upon learning that he would have to move 20 pieces of rebar, plaintiff asked Bernstock if he could use the crane. Bernstock responded, with expletives, that he needed the steel "now," "one at a time." About an hour after the accident, Bernstock informed plaintiff of the decision to shut the job down for the day because of the rain. Additionally, when plaintiff returned to work the next day, he was instructed not to do anything. This testimony could support the conclusion that plaintiff was following the direction of the general foreman, and did not have the authority to stop work based on a safety issue.
Notably, the record is devoid of evidence as to who had the authority to stop work or who had a say in ceasing work due to a safety condition. Additionally, the parties did not submit any objective or scientific evidence as to the extent of the rain at the time plaintiff fell. To that end, Mote admitted that it was sometimes considered acceptable to continue working in the rain and that he did not know whether he would have stopped the work if he had been present. Additionally, plaintiff explained that he was wearing protective gear and was tied off while performing the work, evidencing that safety protocols were followed. While it is true that plaintiff requested the use of the crane, which the general foreman denied, there is no indication that the use of the crane was connected to the inclement weather or whether the rain was a safety concern that was raised by plaintiff prior to the accident.
In light of the conflicting testimony and lack of evidence noted above, issues of fact remain as to whether it was acceptable to work under such slippery conditions, even though plaintiff utilized the appropriate safety equipment. Moreover, viewed in the light most favorable to defendants as the nonmoving parties (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), the evidence is inconclusive as to whether plaintiff's decision to work in the rain, rather than simply [*3]following his general foreman's instructions about what work to perform, was the sole proximate cause of his slip-and-fall accident. As a result, this case is distinguishable from the line of cases relied upon by the dissent that conclude that a plaintiff is not the proximate cause of an accident when there is undisputed evidence that they were following the instructions of a foreman. Here, plaintiff was also a foreman with specific duties and potential control over the work that he and his crew were performing. Whether he could or should have ceased work based on his own authority, as a foreman, his extensive work experience and conditions of the site, there are issues of fact that cannot be resolved on this record.
Accordingly, the order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about June 10, 2021, which, insofar as appealed from as limited by the briefs, granted plaintiff's motion for partial summary judgment on so much of the Labor Law § 241(6) claim as based on an alleged violation of Industrial Code § 23-1.7(d), should be reversed, on the law, without costs, and the motion denied.
All concur except Manzanet-Daniels, J.P. and Mendez, JJ.
who dissent in an Opinion by Manzanet-Daniels, J.P.
Manzanet-Daniels, J. (dissenting)
Defendant having failed to raise an issue of fact as to whether plaintiff was the sole proximate cause of the accident giving rise to his injuries, I would affirm.
Defendant Legacy Yards Tenant, LP was the long-term lessee of property located at 501 West 30th Street in Manhattan. Defendant Tutor Perini Building Corp. (Tutor) was both the general contractor on a project to build a 50-story building and a concrete subcontractor as to the superstructure for tower C. Nonparty B&R Consultants & Rebar Steel, plaintiff's employer, was the subcontractor responsible for installing the reinforcing elements in the concrete superstructure. The 50-year-old plaintiff, a lather foreman, reported to and received instructions from Greg Shannon and Phil Bernstock, the general foremen on the site. Greg Shannon determined which crew members would work with plaintiff, and on which parts of the jobsite. Phil Bernstock instructed plaintiff on what work needed to be done daily, unless plaintiff was already working on a specific project. He was also in charge of supervising plaintiff and his crew. Plaintiff testified he was only responsible for providing his crew safety instructions and to perform the tasks assigned and supervised by his general foremen. Plaintiff's testimony is corroborated by Jesse Mote. Mote, a senior engineer/assistant superintendent employed by Tutor Perini on the day of the accident, testified that Phil Bernstock was plaintiff's general foreman, was the superior foreman, and that plaintiff took directions from him.
On June 1, 2015, plaintiff and his crew of six to eight B&R workers were told to install rebar on the 40th floor of the C tower. Each rebar rod was 24 feet long and weighed [*4]about 110 to 120 pounds. Plaintiff and two of his crew members, "Ian" and "AJ," were working on an elevated level called a "gantry," which had a plywood floor. They would move the rebar about 10 feet and hand it over the edge of the gantry to workers on the floor 15 feet below. Plaintiff was wearing protective gear and was tied off while performing the work.
It had been raining "consistently" since 7:00 a.m. when plaintiff began his shift. Plaintiff described the rain as "[i]n between . . . not misting, but not raining hard." After working about half an hour and moving five rebar, plaintiff asked Ian to use the crane so that the job might go faster; Ian told plaintiff that the crane was "busy" and did not give any indication as to when it would be available, so plaintiff and his crew continued lowering the rebar manually.
Bernstock instructed plaintiff to lower the rebar manually notwithstanding the fact that it was raining; when plaintiff asked for the crane to assist with lowering the bars, Bernstock refused, telling him to "[g]ive me the f***ing steel. I need it now. One at a time." Plaintiff did not have a choice. He could not stop the work due to the rain or wait for the crane, because Phil Bernstock would not allow it, and directed him to continue working (see Rubino v 330 Madison Co., LLC, 150 AD3d 603, 604 [1st Dept 2017]).
Plaintiff was lowering a rebar toward a worker on the lower level when he felt his boots starting to slip. Plaintiff's right foot got caught in an electrical pipe near the edge, and he fell while continuing to hold onto the rebar. At that time, plaintiff noticed that the plywood was slippery.
Immediately after he fell, plaintiff felt excruciating pain from his right foot to his lower back. Within a few seconds, Ian and AJ ran over, took the rebar from plaintiff, and handed it down to the lower level, and plaintiff sat down. Shortly after, Bernstock told plaintiff that they were shutting the project down because of too much rain.
Mote testified that Tutor was onsite daily and interacted with B&R to ensure that the performance of the work was of high quality and in compliance with the contract. Tutor had the "power to tell [plaintiff] where he could be working on an individual day," and Mote was required to ensure that the subcontractors were "working in a safe fashion."
Mote testified that "just because the [gantry] floor is wet doesn't mean it's unsafe to work . . . [I]t is especially true on a concrete job where you're placing wet things all the time." When specifically asked whether he would have asked plaintiff to stop working on the gantry while it was raining, Mote replied: "I can't say for certain without having observed what happened on that day whether or not I would have done something. It's just too tough to say," clarifying, however, that if there was "undue risk" in the activity that he "would stop it 100 percent."
Tutor presented no evidence that it directed plaintiff or B&R to stop work on that [*5]day, or that plaintiff disobeyed a stop work order. Tutor's claim that it was plaintiff and plaintiff alone who made the determination whether the floors were wet enough to cause a slippery or unsafe condition is belied by Mote's testimony that Tutor had the authority to determine the degree of rain that would permit and stop work. Tutor acknowledged that it had previously stopped work at the project and that it was aware that it was raining at the time of the accident. Indeed, Bernstock's imperious directive to "[g]ive me the f***ing steel," notwithstanding the precipitation and the unavailability of the crane, refutes any notion that plaintiff had the "control" over the work that the majority perceives. There was no expert testimony that the rainfall that day was too dangerous for plaintiff and his crew to continue working.
Industrial Code (12 NYCRR) § 23-1.7(d), titled, "Slipping Hazards" states in relevant part, "Employers shall not suffer or permit any employee to use a . . . . scaffold, platform or other elevated working surface which is in a slippery condition," and specifically enumerates "water" as a substance that causes slippery footing. Plaintiff's unrefuted testimony that he slipped on the wet plywood gantry 15 feet above the cement deck establishes prima facie that defendants violated Labor Law § 241(6), as predicated by Industrial Code § 23-1.7(d) and defendants have not raised any issues of fact (see Luciano v New York City Hous. Auth., 157 AD3d 617 [1st Dept 2018]; Pereia v New School, 148 AD3d 410 [1st Dept 2017]; Potenzo v City of New York, 189 AD3d 705 [1st Dept 2020]).
Plaintiff met his initial burden on the motion by establishing that he was directed to lower rebar manually by his foreman, notwithstanding the ongoing rain. Defendant, in turn, failed to raise an issue of fact as to whether plaintiff was the sole proximate cause of his accident. Tutor presented no evidence, despite its daily presence on the project, that it directed plaintiff or his employer to stop work on the day of the accident or that plaintiff disobeyed a stop work order; indeed, the evidence showed that plaintiff was following the foreman's instruction, negating application of the defense (see Hayek v Metroplitan Transp. Auth., 195 AD3d 568, 568 [1st Dept 2021] ["[g]iven the undisputed evidence that plaintiff was following the directions of his foreman at the time of his injury, plaintiff cannot be the sole proximate cause of his injuries"]; Vucetic v NYU Langone Med. Ctr., 173 AD3d 527, 527 [1st Dept 2019] [a plaintiff who was following his foreman's instructions was not the sole proximate cause of his accident]; Cuentas v Sephora USA, Inc., 102 AD3d 504, 505 [1st Dept 2013] [the plaintiff could not be deemed the sole proximate cause of his accident where his use of a ladder was consistent with his employer's instructions]; Fernandez v BBD Developers, LLC, 103 AD3d 554, 555 [1st Dept 2013] [the plaintiff could not be deemed the sole proximate cause where [*6]his supervisor directed him to use a rope that was too long to protect him]; Harris v City of New York, 83 AD3d 104, 110-111 [1st Dept 2011] [finding, as a matter of law, that the plaintiff was not the sole proximate cause because he did not take "a foolhardy risk," but followed his foreman's instruction]).
Notably, plaintiff did not unilaterally decide to lower the rebar manually, but was expressly instructed by his foreman to "[g]ive me the f***ing steel" after he requested and was refused permission to use the onsite crane (see Gove v Pavarini McGovern, LLC, 110 AD3d 601, 602-603 [1st Dept 2013] [finding that the plaintiff, who made fruitless efforts to secure permission to use an on-site crane and thereafter resorted to use of a rope method, was not the sole proximate cause of his accident]). In Gove, as here, the plaintiff was moving rebar to a lower level. In Gove, as here, the plaintiff made fruitless efforts to secure an onsite crane. The plaintiff in Gove was thereupon directed to manually lower the rebar. As here, the plaintiff agreed to do so only after expressing reservations about the method employed. We held as a matter of law that the plaintiff could not be the sole proximate cause of his accident because he did not unilaterally decide to use the rope method. We rejected defendants' further argument that the plaintiff was negligent in lowering the rebar rather than separating it into smaller bundles, noting that since the record established that a violation of the statute was a contributing case of the plaintiff's accident, any contributory negligence on the plaintiff's part was not a defense to the claim.
The majority makes no real effort to grapple with this precedent, dismissing it summarily. The evidence establishes, however, that whatever "control" plaintiff could be said to have by virtue of being foreman of the small crew, he was unequivocally subject to the direction and oversight of Bernstock, his superior and the general foreman, who directed him to keep working notwithstanding the ongoing precipitation and the fact that the crane was unavailable. The record shows that plaintiff requested and was denied use of a crane, whereupon Bernstock directed him to continue working—and not, as the majority appears to suggest, that plaintiff decided unilaterally to continue working in the rain. Indeed, he was acting at Bernstock's explicit direction. We have never held that where a worker has been explicitly instructed by his superior to engage in the very activity giving rise to the injury—here, the immediate instruction to "[g]ive me the steel," overriding plaintiff's objections—that the worker may be considered to be the sole proximate cause of his accident. As Gove instructs, since plaintiff did not unilaterally decide to manually lower the rebar, and was directed to do that by Bernstock, he cannot, as a matter of law, be the sole proximate cause. The majority's arguments—in essence, that plaintiff should have known better and [*7]stopped the work because of the rain—go to contributory negligence, if anything, and do not create an issue of fact as to sole proximate cause.
Plaintiff's act of striking the electrical pipe after he slipped was neither extraordinary or attenuated from his slipping and thus does not constitute a supervening act relieving defendant of liability. "An independent intervening act may constitute a superseding cause, and be sufficient to relieve a defendant of liability [only] if it is of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not be reasonably attributed to them" (Gordon v Eastern Ry. Supply, 82 NY2d 555, 562 [1993]). There is no medical evidence establishing that plaintiff's lower back injury occurred solely as a result of striking the pipe and not during the act of slipping or sliding or both.
Order, Supreme Court, Bronx County (Lucindo Suarez, J.), entered on or about June 10, 2021, which, insofar as appealed from as limited by the briefs, reversed, on the law, without costs, and the motion denied.
Manzanet-Daniels, J.P., Kern, Singh, Kennedy, Mendez, JJ.
Opinion by Kennedy, J. All concur except Manzanet-Daniels, J.P. and Mendez, JJ. who dissent in an Opinion Manzanet-Daniels, J.P.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 30, 2022